| DOCKET NO: FBT-CV 23-6123457-S | : | SUPERIOR COURT |
|---|---|---|
| NATHANIEL GETZ, EXECUTOR OF THE ESTATE OF SUZANNE FOUNTAIN | : | J.D. OF FAIRFIELD |
| V. | : | AT BRIDGEPORT |
| STURM, RUGER & COMPANY, INC. | : | AUGUST 8, 2023 |

## AMENDED COMPLAINT

1.      This is a civil action for damages stemming from the shooting at King Soopers supermarket in Boulder, Colorado, on March 22, 2021.

2.      Defendant Sturm, Ruger & Company, Inc. (hereinafter "Ruger") is a company that was founded in Connecticut in 1949, incorporated in Delaware in its current form in 1969, and headquartered in Southport, Connecticut. At all relevant times, Ruger manufactured, marketed, and sold AR-556 full-length rifles and short-barreled rifles, the latter of which Ruger misleadingly called "pistols".

3.      Ruger manufactured the semi-automatic AR-556 "Pistol" that was used in the shooting at King Soopers supermarket on March 22, 2021, resulting in the deaths of ten people, including Suzanne Fountain.

4.      At all relevant times, the Plaintiff, Nathanial Getz, was appointed Executor of the Estate of Suzanne Fountain.

5.      Ruger designed the AR-556 and introduced it in 2014 as a full-length entry-level, AR-15-style rifle.

6.     In 2019, Ruger introduced a "pistol" variant of the AR-556 Rifle line and marketed it with the following photograph, including in the weeks leading up to the mass shooting at the King Soopers supermarket in Boulder, Colorado:



*Ruger promotional image of an AR-556 Pistol*

7.     The AR-556 "Pistols" function similarly to Ruger's full-length AR-556 Rifles but have shortened barrels. Ruger also assembled the "pistol" variant with an altered stock in an attempt to circumvent the requirements of federal law applicable to short-barreled rifles.

8.     Specifically, instead of pairing the AR-556 "Pistols" with the conventional shoulder stocks used for its full-length AR-556 Rifles, Ruger assembled, packaged, and sold them with SBA3 stabilizing braces manufactured by SB Tactical, a third-party company.

9.     SB Tactical claims that the purpose of the SBA3 stabilizing brace is to assist shooters in firing AR-15-style "pistols" with just one hand, extending the gun forward, away from their bodies, while shooting—like smaller, more conventional

pistols. But in reality, SBA3 stabilizing braces are shoulder stocks in design and function. By pairing its AR-556 "Pistols" with SBA3 stabilizing braces, Ruger enabled and intended shooters to brace the weapons against their shoulders while firing— like short-barreled rifles.

10.     Ruger's AR-556 "Pistols" also feature a shortened version of the same rail system available on Ruger's full-length AR-556 Rifles and similar to those found on other AR-15-style rifles.

11.     Ruger designed the AR-556 "Pistol" such that it would utilize the same ammunition and magazines as the full-length AR-556 Rifles and other AR-15-style weapons.

12.     As a result of Ruger's design choices, the AR-556 "Pistol" is significantly more deadly than other pistols on the market.

13.     Ruger's intent in packaging and selling the AR-556 "Pistol" with an SBA3 stabilizing brace in place of a conventional shoulder stock was to allow consumers to use its weapon as an AR-15-style short-barreled rifle while evading federal laws and regulations targeted at short-barreled rifles.

14.     Ruger designed, marketed, and sold its AR-556 "Pistols" knowing that they would be purchased by consumers who did not undergo the rigorous vetting required by federal law for purchasers of short-barreled rifles, and knowing and intending that they would be fired from the shoulder.

15.     The application process for a civilian consumer seeking to own a short-barreled rifle includes providing fingerprints and a photo for a comprehensive

background check, notification to the chief law enforcement officer in the applicant's locality, payment of a $200 tax, and approval by Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF")—a process that typically takes as long as *seven months* to complete.

16.     Tellingly, Ruger produces a near-identical weapon for law enforcement buyers that, upon information and belief, it *does* properly market and sell as a short-barreled rifle:



*Ruger promotional image of its AR-556 MPR short-barreled rifle, which Ruger distributes to law enforcement buyers.*

17.     AR-15-style weapons have become the weapon of choice for the deadliest mass shooters and, since their introduction to the market, AR-15-style "pistols," like the AR-556, have been used in multiple mass shootings, including the shooting that is the subject of this action.

18.     On March 22, 2021, in Boulder, Colorado, a lone gunman arrived at King Soopers—a supermarket teeming with unsuspecting shoppers—armed with a powerful Ruger AR-556 "Pistol," which was actually a short-barreled rifle. The

gunman opened fire indiscriminately, firing the "pistol" from his shoulder just like an AR-15-style short-barreled rifle, leaving no opportunity for the terrified customers to flee. In less than 8 minutes, the shooter killed Suzanne Fountain, in whose memory Plaintiff files this suit, and nine other people: Neven Stanisic, Kevin Mahoney, Tralona Bartkowiak, Rikki Olds, Denny Stong, Lynn Murray, Teri Leiker, Jody Waters, and Boulder Police Officer Eric Talley.

19.    The shooter acquired his Ruger AR-556 short-barreled rifle on March 16, 2021, a mere *six days* before the mass shooting.

20.    How was he able to bypass the rigorous and months-long application process that would have delayed his possession of the weapon, alerted local law enforcement of his purchase, and, most importantly, prevented him from obtaining it in time to kill Suzanne Fountain and nine other people present at King Soopers on March 22?

21.    The answer is that Ruger knowingly designed, made, and intended the AR-556 "Pistol" to be fired from the shoulder and made a callous and disingenuous decision to manufacture, market, and sell this type of weapon as an AR-15-style "pistol" rather than as what it is: a short-barreled rifle. In doing so, Ruger unlawfully marketed and sold these weapons by bypassing critical safety requirements imposed by federal law.

22.    Ruger's decision not to market and distribute its AR-556 "Pistols" as short-barreled rifles expedited and paved the way for the gunman's quick and easy purchase of his weapon and his shoulder-firing of it on March 22, 2021, and thus was

6

a proximate cause of the deaths of Suzanne Fountain and the nine other victims of the King Soopers mass shooting.[1]

## PARTIES

23.    Plaintiff Nathaniel Getz is the executor of the Estate of Suzanne Fountain. Ms. Fountain, one of the victims of the King Soopers shooting, was Mr. Getz's mother.



*Suzanne Fountain*

24.    Suzanne Fountain lived about 20 minutes away from the King Soopers in Broomfield, Colorado. She lived there for 29 years, raising her son.

25.    She was an award-winning theater actress. Her credits included performances as the nurse in "Wit," which garnered praise from critics, and as Laura in "The Glass Menagerie," for which she won a Denver Drama Critics Circle Award. She also worked at the Boulder Community Hospital as a financial advisor and most recently worked as a Medicare licensed agent, helping seniors enroll in Medicare.

---

[1]    As alleged herein, Ruger's AR-556 "Pistols" were in fact short-barreled rifles, not pistols. For purposes of clarity in distinguishing them from Ruger's line of full-length AR-556 Rifles, Plaintiff uses the misleading model name "AR-556 Pistol," which Ruger assigned to these short-barreled rifles.

26.     Ms. Fountain had many friends and was a warm and gracious host with an open home for those in her community.

27.     As noted above, Defendant Ruger is a Connecticut-based Delaware corporation incorporated in its present form in 1969. Its principal place of business and headquarters are located at 1 Lacey Place, Southport, Connecticut, 06890. Ruger owns its corporate headquarters building. Additionally, Ruger leases a facility in Enfield, Connecticut.

28.     Ruger's principal executive officers work in Connecticut. These include Ruger's president and chief executive officer, chief financial officer, vice president of sales, and general counsel. Upon information and belief, additional legal and compliance employees work in Connecticut, including Ruger's associate general counsel for ATF compliance.

29.     Upon information and belief, other Ruger employees based in Connecticut include engineers involved in designing Ruger weapons.

30.     Upon information and belief, Ruger executives and other employees based in Ruger's Connecticut headquarters direct, control, and/or approve (a) the design of Ruger's weapons; (b) Ruger's agreements to partner with third-party companies and/or to acquire firearms accessories or component parts from third party companies; and (c) Ruger's policies and procedures for compliance with the Gun Control Act of 1968 ("GCA"), 18 U.S.C. §§ 921-931, and the National Firearms Act of 1934 ("NFA"), 26. U.S.C. §§ 5801-5872.

31.    Upon information and belief, the heads of Ruger's manufacturing plants outside of Connecticut all report to employees based out of the Connecticut headquarters office.

## FACTUAL ALLEGATIONS

### A.    Short-Barreled Rifle Basics

32.    The shooter chose a short-barreled rifle that Ruger manufactured, marketed, and sold under the misleading model name "AR-556 Pistol" to carry out his attack.

33.    Like many short-barreled rifles, Ruger's AR-556 Pistol is an AR-15-style weapon. It is more similar in design and function to a full-length AR-15 rifle than it is to a typical 9-mm pistol.

34.    Ruger itself marketed the AR-556 Pistols as being designed like rifles.

35.    Short-barreled rifles, as the name suggests, feature barrels that are shorter than those of their full-length counterparts. Shorter barrels make them easier to conceal, transport, and maneuver in tight spaces.

36.    Bullets discharged by AR-15-style short-barreled rifles travel with significantly higher velocity than bullets discharged by conventional 9-mm pistols. Short-barreled rifles, such as Ruger's AR-556 Pistols, are designed to use rifle-caliber ammunition rather than handgun ammunition. As compared to wounds caused by typical handgun ammunition, wounds caused by high-velocity, rifle-caliber ammunition generally cause more widespread and catastrophic damage to the human body.

37.     Short-barreled rifles, like their full-length counterparts, also include a stock that allows a shooter to brace the weapon against his shoulder. "Shouldering" a rifle enables a shooter to direct the rifle's firepower more accurately and better manage the rifle's recoil.

38.     AR-15-style short-barreled rifles, such as the Ruger AR-556 Pistol, combine devastating firepower with the concealability and maneuverability of smaller guns.

**B.     The National Firearms Act and the Gun Control Act Regulate Short-Barreled Rifles**

39.     All firearms are regulated by the Gun Control Act ("GCA"), codified at 18 U.S.C. §§ 921-931.

40.     Short-barreled rifles and other particularly dangerous firearms are further regulated by the National Firearms Act (NFA), which is codified at 26 U.S.C. §§ 5801-5872.

41.     Congress first enacted the NFA in 1934, with the principal aim of restricting criminal access to weapons associated with organized crime.

42.     Short-barreled rifles were popular with organized crime members at the time—infamously, Bonnie Parker and Clyde Barrow preferred a "Whippet," a Remington Model 11 shotgun with a shortened barrel, so-named because they could conceal it under a long coat and "whip it" out in an ambush. The 1929 St. Valentine's Day Massacre was also committed by gang members armed with Thompson submachine guns ("Tommy guns") with short barrels.

43.     Congress amended the NFA in 1968, and the associated legislative

10

history included the congressional finding that "short-barreled rifles are primarily weapons of war and have no appropriate sporting use or use for personal protection[.]" Sen. Rep. No. 90-1501, at 28 (1968).

44.     In relevant part (26 U.S.C. § 5845(a)(3)-(4), (c)), the NFA regulates short-barreled rifles that meet certain specifications:

a.     The gun has a rifled bore, through which one round of ammunition will fire for each pull of the trigger;[2]

b.     The rifle's **barrel length is less than 16 inches** *or* its overall length is less than 26 inches; *and*

c.     The rifle is **designed, made, and intended to be fired while braced against the shooter's shoulder**.

45.     The GCA includes parallel definitions. 18 U.S.C. § 921(a)(7) & (a)(8).

46.     Manufacturers engaged in the business of manufacturing short-barreled rifles must pay an annual "special occupational tax" (SOT) of $1,000, for each location at which they manufacture short-barreled rifles. 26 U.S.C. § 5801; 27 C.F.R. §§ 479.31-479.32, 479.34-479.38.

47.     For each short-barreled rifle that they produce, manufacturers must, among other things: (a) register it in the National Firearms Registration and Transfer Record (NFRTR); and (b) before transferring it to an individual or another entity, such as a distributor or a dealer, file a transfer application with the ATF and obtain the ATF's approval of the transfer. 26 U.S.C. § 5812; 27 C.F.R. §§ 479.84-

---

[2]     The term "bore" refers to the interior of a gun's barrel. Bores can be "smooth" or "rifled," with the latter term referring to grooves that cause a bullet to spin before leaving the barrel. Bullets discharged from barrels with rifled bores, rather than smooth bores, tend to travel further and at a higher velocity.

479.87; 479.101-479.103.

48.     If a manufacturer fails to register and transfer a short-barreled rifle in compliance with the NFA, it becomes subject to seizure and forfeiture. 26 U.S.C. § 5872. Entities that violate the NFA are subject to criminal penalties. 26 U.S.C. § 5871.

49.     Similarly, the GCA prohibits manufacturers from selling or delivering short-barreled rifles to any person without the proper authorization. 18 U.S.C. § 922(b)(4).

50.     Like a manufacturer, a dealer of short-barreled rifles must pay an annual SOT pursuant to the NFA. 26 U.S.C. § 5801.

51.     Prior to purchasing a short-barreled rifle from a dealer, a civilian consumer must complete an application process, obtain ATF approval, and the gun must be registered to him in the NFRTR. 26 U.S.C. § 5812; 27 C.F.R. §§ 479.84-479.85.

52.     The NFA-mandated application to purchase a short-barreled rifle involves several steps:[3]

    a.    <u>Transfer Application</u>: The purchaser must complete ATF Form 4, which is an application prescribed by the ATF. Among other information, the purchaser must include a passport-style photograph and fingerprints, via two FBI fingerprint cards, with the application. 27 C.F.R. §§ 479.84-479.85.

---

[3]     In order to purchase any firearm from a licensed dealer, including a short-barreled rifle, an individual purchaser must complete ATF paperwork and submit to a background check in accordance with the federal Gun Control Act. The NFA-mandated application and approval process described herein operates in addition to, not in lieu of, the process mandated by the Gun Control Act.

b.   <u>Transfer Tax</u>: The transfer application must include payment of a $200 tax. 27 C.F.R. § 479.84.

c.   <u>Law Enforcement Notification</u>: Prior to submission to the ATF, the purchaser's application must be forwarded to the chief law enforcement officer of the purchaser's locality. 27 C.F.R. § 479.84(c). The application form instructs the chief law enforcement officer to alert the ATF if they have information that would disqualify the purchaser from possessing a firearm.

d.   <u>Background Check</u>: The purchaser must undergo a background check, performed by the ATF.

e.   <u>ATF Approval</u>: The retail purchaser cannot take possession of the short-barreled rifle unless and until the ATF approves the transfer application. 26 U.S.C. § 5812; 27 C.F.R. § 479.86.

53.   As of March 2021, the ATF's average processing time for a retail consumer's application to purchase an NFA-regulated firearm was seven months.

**C.   Ruger Knowingly Violated the National Firearms Act and the Gun Control Act**

**i.   Ruger Knowingly Designed and Manufactured AR-556 "Pistols" Configured with Stabilizing Braces**

54.   Beginning in the spring of 2019, Ruger released a line of AR-556 Pistols in the civilian market. Ruger's AR-556 Pistols were shorter versions of the AR-556 Rifles it had previously released.

55.   Upon information and belief, Ruger ceased producing AR-556 Pistols at some time after the King Soopers shooting. But Ruger AR-556 Pistols remain in circulation and available for civilian consumer purchase from third-party sellers.

56.   Ruger's AR-556 Pistols are similar in design and function to its line of AR-556 Rifles. Two principal differences between the rifle line and the so-called Pistol variants are: (a) the barrels of the AR-556 Pistols—which range from 9.5 to 10.5

13

inches, depending on the model—are significantly shorter than the barrels on the AR-556 Rifles, which all exceeded 16 inches; and (b) Ruger configures the AR-556 Rifles with conventional shoulder stocks while it configured the AR-556 Pistols with stabilizing "braces" that functioned as shoulder stocks.

57.    The Ruger AR-556 Pistols weigh between 5.6 and 6.2 pounds unloaded, depending on the exact model.

58.    Ruger did not manufacture the stabilizing braces attached to its AR-556 Pistols. Instead, Ruger partnered with SB Tactical, a manufacturer that provided its SBA3 stabilizing braces for Ruger's use.

59.    SB Tactical produced the first stabilizing brace in 2012. SB Tactical's stated intent was to provide a tool to assist shooters with limited strength or mobility in shooting a pistol with one hand.

60.    To that end, SB Tactical's first stabilizing brace (the SB15), as submitted to the ATF, was made of foam rubber and featured Velcro straps that could secure a shooter's forearm to the rear of an AR-15-style pistol, thereby steadying the weapon for one-handed shooting.

 

*A prototype of SB Tactical's first stabilizing brace, the SB15, attached to an AR-15-style pistol.*

14

61.     As SB Tactical released subsequent models, however, the company innovated toward stabilizing braces that looked and functioned like conventional rifle shoulder stocks.

62.     SB Tactical's SBA3 stabilizing brace, first released in April 2018, resembles a conventional shoulder stock in size, shape, and function.

63.     Ruger assembled its AR-556 Pistols with SBA3 stabilizing braces in place of conventional shoulder stocks. As seen in the image below, the SBA3 brace enables shooters to fire an AR-556 Pistol from the shoulder.



*Still image from YouTube video published on October 18, 2019, by TFB TV, a YouTube channel with 1.33 million subscribers. Image shows a shooter shouldering a Ruger AR-556 Pistol and using the SBA3 stabilizing brace as a shoulder stock.*

64.     Upon information and belief, Ruger sought to cater to civilian consumer demand for short-barreled rifles available outside the rigorous, expensive, and time-consuming NFA approval process and, in order to maintain plausible deniability

15

while producing such unlawful short-barreled rifles, substituted the SBA3 braces for conventional shoulder stocks.

65.     Upon information and belief, Connecticut-based Ruger employees—including but not limited to Ruger engineers—participated in the process of designing the AR-556 Pistol.

66.     Ruger entered into a business relationship with SB Tactical, by means of which it acquired SBA3 stabilizing braces to be attached to the AR-556 Pistols in place of conventional stocks.

67.     SB Tactical brands itself as a company that mocks, and even openly defies, the ATF. For instance, SB Tactical displayed the slogan "Stiff Arm the Establishment" on its home page as early as 2017 and until at least spring 2019, when Ruger launched its AR-556 Pistols. It has published social media content deriding the ATF. And in July 2018, the ATF sent SB Tactical a cease and desist letter, instructing the company to stop marketing several of its stabilizing brace models—including the SBA3—as "ATF Compliant," since SB Tactical had never submitted those models for ATF evaluation. The letter also states that the ATF "does not approve 'stabilizing braces' which are similar or based off shoulder stock designs."

68.     SB Tactical intended the SBA3 stabilizing brace to be used to shoulder AR-15-style "pistols" while evading NFA registration of what would otherwise be short-barreled rifles.

69.     Upon information and belief, Ruger's Connecticut-based corporate management—including, but not limited to, executive-level management and in-

house legal counsel—negotiated and approved the partnership with SB Tactical.

70.     Upon information and belief, Ruger employees based in Connecticut directed, controlled, or engaged in design work, decision-making, and approvals that enabled Ruger's production of its AR-556 Pistols with SBA3 stabilizing braces.

**ii.   Ruger's AR-556 Pistols Configured with SBA3 Stabilizing Braces Were Short-Barreled Rifles Subject to the NFA**

71.     Ruger's AR-556 Pistols meet the NFA's definition of short-barreled rifles:

   a.   <u>Rifled Bore</u>: The AR-556 Pistols have rifled bores, meaning that the interior of the guns' barrels are grooved, rather than smooth. Bullets discharged from barrels with rifled bores, rather than smooth bores, tend to travel further and at a higher velocity, which increases their accuracy on target;

   b.   <u>Discharge Rate</u>: The AR-556 Pistols discharge one round of ammunition per trigger pull;

   c.   <u>Short Barrel</u>: The AR-556 Pistols have barrel lengths between 9.5 and 10.5 inches, well within the 16-inch threshold for short-barreled rifles; and

   d.   <u>Shouldering</u>: By attaching SBA3 stabilizing braces to its AR-556 Pistols, Ruger designed, made, and intended them to be fired from the shoulder.

72.     Design features of the Ruger AR-556 Pistols that demonstrate that Ruger designed, made, and intended them to be fired from the shoulder, include, but are not limited to:

   a.   <u>Method of Attachment:</u> Ruger's decision to equip its AR-556 Pistols with notched "carbine" receiver extensions for attaching the braces—allowing the shooter to extend or retract the brace and lock it into one of five positions, like a conventional AR-15-style shoulder stock, to fit his or her shoulder better—rather than smooth pistol receiver extensions that do not allow for this kind of adjustability or provide support for shoulder-firing;

17

     b.    <u>Length of Pull:</u> The AR-556 Pistols' length of pull (i.e., the distance from the trigger to the rear of the SBA3 brace), which is more consistent with an AR-15-style rifle fired from the shoulder than with a handgun; and

     c.    <u>Weight</u>: The heavy weight of the AR-556 Pistol: At between 5.6 and 6.2 pounds unloaded, Ruger's AR-556 Pistols are nearly as heavy as Ruger's full-length, AR-556 Rifle models, most of which weigh between 6.5 and 6.8 pounds and all of which Ruger acknowledges are meant to be fired with two hands and braced against the shoulder.

73.    The design of the SBA3 brace also demonstrates that the brace is a shoulder stock and that the AR-556 Pistols configured with the braces are short-barreled rifles.

74.    The SBA3 stabilizing brace was significantly slimmed down from the original SB15 design. The SBA3 functions poorly, if at all, as a stabilizing brace that can be strapped to a shooter's forearm and support steady, one-handed firing of a 5.6-pound or heavier gun.[4] Instead, the SBA3 works best as a shoulder stock, which is how Ruger and SB Tactical intended it to be used.

---

[4]    For context, a 2-liter bottle of soda weighs about 4.4 pounds. So, holding a Ruger AR-556 Pistol straight out with one hand would require holding something heavier than a 2-liter bottle of soda straight out and stably enough to fire a gun safely.



*Still image from YouTube video published on July 5, 2021, by The Gun Nut, a YouTube channel. Image shows a shooter shouldering an AR-556 Pistol and using the SBA3 stabilizing brace as a shoulder stock.*

75.    The SBA3 brace features components that are typical of shoulder stocks, including, but not limited to, ample rear surface area for bracing against a shoulder.

76.    These and other design features indicate that the Ruger AR-556 Pistols, with their attached SBA3 braces, were designed, made, and intended to be fired from the shoulder.

77.    The AR-556 Pistols lack any features that would prevent their use as short-barreled rifles.

78.    Ruger's AR-556 Pistols are near-duplicates of short-barreled rifles that Ruger manufactured for the law enforcement market.

79.    Ruger offers short-barreled AR-556 MPR rifles only to law enforcement buyers. These rifles are properly labeled and, upon information and belief, registered

19

as short-barreled rifles by Ruger. The short-barreled AR-556 MPR rifles share near-identical specifications with Ruger's AR-556 Pistols.



*Ruger promotional image of a short-barreled AR-556 MPR rifle, available only to law enforcement*



*Ruger promotional image of an AR-556 Pistol*

80.   The differences between the Ruger's AR-556 Pistols and its short-barreled, law-enforcement-only AR-556 MPR rifles are minimal: the MPR rifles have conventional shoulder stocks, while the Pistols have SB Tactical SBA3 braces that function as shoulder stocks; the pistols grips differ between the two models; and Ruger includes iron sights with the MPR rifles, but did not do so with the Pistols—though, identical sights and other aiming devices could be added to the Pistols by the users.

81.     None of these differences affect the AR-556 Pistol's status as a short-barreled rifle. Functionally, Ruger's AR-556 Pistols and law-enforcement-only AR-556 MPR short-barreled rifles are near-identical short-barreled rifles.

82.     Upon information and belief, the design of the AR-556 Pistols, which are near-duplicates of what Ruger admits are short-barreled rifles, was directed and/or approved by employees working in Ruger's Connecticut headquarters.

### iii.     Consumers Treated the AR-556 Pistols as Short-Barreled Rifles

83.     As early as 2019—the year Ruger launched the AR-556 Pistol line—consumers used the AR-556 Pistols as rifles fired from the shoulder.

84.     During the relevant time period, easily accessible and widely circulated information in the public domain indicated that consumers shouldered the AR-556 Pistols. Such information included, but was not limited to:

a.     Reviews published in gun industry media outlets in which reviewers discussed shouldering the AR-556 Pistols;

b.     Social media content in which civilian shooters shouldered AR-556 Pistols or discussed the experience of shouldering the AR-556 Pistols; and

c.     Online content discussing or portraying the use of SBA3 stabilizing braces as shoulder stocks.

85.     Well before March 2021, Ruger knew and intended that consumers of its AR-556 Pistols were regularly and commonly using, and would regularly and commonly use, those weapons as shoulder-fired short-barreled rifles.

86.     Upon information and belief, Ruger also knew of SB Tactical's advertising that promoted the SBA3 stabilizing brace as creating a "third point of

contact." When used to brace a pistol against a shooter's forearm, a stabilizing brace involves only two points of contact: the forearm and the hand on the pistol grip. The third point of contact to which SB Tactical's advertising referred is the user's shoulder, indicating that SB Tactical intended—and Ruger knew that SB Tactical intended—the SBA3 to be used to shoulder the weapon.



*Still image from YouTube video published on August 4, 2019, by Sunday Gun Day, a YouTube channel. Image shows a shooter shouldering an AR-556 Pistol and using the SBA3 stabilizing brace as a shoulder stock, creating three points of contact: his shoulder, his right hand on the pistol grip, and his left hand on the handguard.*

      **iv.    Before the Shooting, the ATF Issued a Letter Indicating that it Considered the SBA3 Brace to be a Shoulder Stock and an AR-556 Pistol Configured with an SBA3 Brace to be a Short-Barreled Rifle**

87.    Companies within the gun industry may, but are not required to, submit samples of their firearms or other products to the ATF for review and classification.

22

88.    SB Tactical, the company that supplied Ruger with the SBA3 stabilizing braces it used to assemble the Ruger AR-556 Pistols, began communicating with the ATF as early as 2012 about the legality of several of its stabilizing brace models.

89.    In May 2019, SB Tactical submitted a Ruger AR-556 Pistol with an SBA3 stabilizing brace—in a nearly identical configuration to that used by the shooter to kill ten people at King Soopers—to the ATF for review and classification. Upon information and belief, Ruger, through executives based in its Connecticut headquarters, approved and/or were aware of SB Tactical's submission of the AR-556 Pistol to the ATF.

90.    The ATF responded in a March 2020 letter to SB Tactical, in which it found that the Ruger AR-556 Pistol, as configured with an SBA3 stabilizing brace, "is consistent with weapons designed and intended to be fired from the shoulder."  Since the barrel of the firearm was under 16 inches in length and it had a rifled bore, the AR-556 Pistol was, according to the ATF, "properly classified as a 'short-barreled rifle.'" ATF concluded that "because the firearm in question [submitted] was manufactured as a 'short-barreled rifle,' and therefore a 'rifle,' it can never be reconfigured as a 'pistol.'" While the letter was not a final classification letter and did not constitute final agency action, it gave SB Tactical notice of the ATF's conclusion that the Ruger AR-556 Pistol falls under the NFA regulation of short-barreled rifles and was not properly or lawfully classified as a pistol.

91.    The ATF's analysis spanned 26 pages and included a detailed review of the AR-556 Pistol's and SBA3 brace's objective design features.

92.     Ruger knew or should have known that, as of in or around March 2020, the ATF considered its AR-556 Pistol configured with an SBA3 brace to be a short-barreled rifle subject to NFA regulation.

> **v.    Ruger Failed to Register and Transfer Its AR-556 Pistols, in Violation of the NFA**

93.     Ruger violated the NFA in manufacturing, assembling, and transferring its AR-556 Pistols, including the weapon subsequently purchased by the shooter.

94.     Ruger did not register the AR-556 Pistols in the National Firearms Registration and Transfer Record (NFRTR). It did not submit the required ATF paperwork to register the short-barreled rifles within 24 hours, as required by the NFA, or at any time thereafter.

95.     As a result of Ruger's failure to register the AR-556 Pistols it produced and assembled, those weapons became contraband. Ruger could not lawfully transfer them to anyone other than government recipients. Nor could a downstream distributor or dealer cure Ruger's failure by registering the weapons itself before selling them to civilian consumers.

96.     Nevertheless, Ruger unlawfully distributed the AR-556 Pistols to the civilian consumer market.

97.     Ruger violated the NFA requirement to seek and obtain ATF approval prior to transferring the AR-556 Pistols it manufactured and assembled. Ruger also knowingly caused, induced, and aided and abetted the downstream violations of the NFA by dealers and purchasers of AR-556 Pistols who did not comply with the above-described rigorous vetting requirements applicable to short-barreled rifles.

98.     Upon information and belief, Ruger's failure to comply with and violations of the NFA were the result of decisions made by employees based in its Connecticut headquarters.

**D.   Ruger's Unlawful Conduct Was a Proximate Cause of the Deaths of Suzanne Fountain and the Nine Other Victims of the King Soopers Mass Shooting**

99.     On March 16, 2021, the King Soopers gunman—a then 21-year-old man with a history of misdemeanor assault—purchased his Ruger AR-556 short-barreled rifle at Eagles Nest Armory, a licensed federal firearms dealer in Arvada, Colorado ("Eagles Nest").

100.    Because Ruger failed to properly register the short-barreled rifle in the NFRTR as required by the NFA, the shooter was not required to by Eagles Nest and did not:

   a.    Apply to ATF for authorization to purchase the weapon;

   b.    Take the necessary steps to be fingerprinted and photographed;

   c.    Pay the $200 NFA tax;

   d.    Forward his application to the chief local law enforcement officer in his area to determine if they had information that would disqualify him from possessing the firearm;

   e.    Wait several months for the ATF to affirmatively approve his application to purchase the weapon; or

   f.    Allow the ATF to add his own name to the NFRTR registry as the new owner of the gun.

101.    Instead, as a result of Ruger's failure to register the highly lethal short-barreled rifle as required by the NFA, the shooter purchased it as quickly and easily

25

as he would a basic shotgun—by passing a basic background check and walking out of Eagles Nest with the AR-556 Pistol all in the same day.

102.    Ruger's failure to register the shooter's AR-556 Pistol in the NFRTR at the time of production and assembly rendered it an illicit firearm.

103.    Ruger's unlawful distribution of the shooter's firearm in the civilian consumer market enabled the shooter to quickly and easily acquire an unregistered, illegal short-barreled rifle.

104.    Upon information and belief, had Ruger complied with the NFA and registered the shooter's AR-556 Pistol, it would not have been for sale at Eagles Nest for the shooter to purchase because, upon information and belief, Eagles Nest does not sell guns that must go through the NFA process.

105.    Had Ruger complied with the NFA and registered the shooter's AR-556 Pistol, the gunman would not have submitted himself to the rigorous NFA vetting requirements outlined above to obtain such a weapon, and even if he had, he would not have obtained the Ruger AR-556 Pistol from Eagles Nest on March 16, 2021, in time to kill Suzanne Fountain and the nine other victims on March 22, 2021.

106.    The shooter used Ruger's AR-556 Pistol to kill 10 people, including Suzanne Fountain, in mere minutes. Though he also brought a handgun to the shooting, he chose to use the deadlier short-barreled rifle, and, as a consequence, he was able to kill more people more quickly.

107.    During the deadly rampage at the King Soopers, the shooter shouldered the AR-556 Pistol, as Ruger designed, made, and intended it to be used.

108.   The shooter did not fall through a crack in the NFA-mandated process. Instead, he sprinted through a gaping hole created by Ruger's refusal to treat its AR-556 Pistols as the short-barreled rifles they are. Ruger profited from consumer demand for unregistered short-barreled rifles, and 10 people lost their lives.

109.   Ruger's actions as described above, including its knowing violations of the NFA and GCA, therefore were a proximate cause of and a substantial factor in the deaths of Suzanne Fountain and the nine other victims of the King Soopers shooting.

## CLAIMS FOR RELIEF

### COUNT ONE: General Statutes § 52-555 Wrongful Death/Violation of Connecticut Unfair Trade Practices Act

110.   Plaintiff incorporates and realleges the above paragraphs as if fully stated here.

111.   The Connecticut Unfair Trade Practices Act prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

112.   Ruger's production, direct and indirect marketing, and sale of its AR-556 Pistols was unfair and deceptive for reasons including, but not limited to:

    a.   Ruger produced, assembled, and distributed short-barreled rifles in violation of the federal National Firearms Act and Gun Control Act. This conduct was immoral, unethical, oppressive, and unscrupulous and offended the public policy goal of preventing illegal gun violence as it has been established by those two statutes;

27

b.   Ruger deceptively marketed its AR-556 Pistols as lawful for civilian consumers to purchase, despite its failure to register and transfer the guns in compliance with the NFA;

c.   Ruger unfairly marketed its AR-556 Pistols as designed like rifles;

d.   Ruger deceptively marketed them as "pistols" for purposes of federal law, rather than as short-barreled rifles;

e.   Ruger unfairly marketed its AR-556 product lines by promoting, directly and indirectly, their assaultive and/or militaristic uses.

113.   Ruger produced, marketed, and sold its AR-556 Pistols without regard for public safety.

114.   Ruger's conduct was unethical, immoral, unscrupulous, oppressive, and reckless.

115.   Ruger's conduct was outrageous, and Ruger acted with reckless indifference to the rights and safety of others, including Suzanne Fountain.

116.   Ruger's conduct, as set forth above, occurred prior to and continued through March 22, 2021.

117.   Ruger's conduct as previously alleged, in whole or in part, constituted a knowing violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a *et seq.*

118.   Ruger's conduct as previously alleged was a proximate cause of and a substantial factor in causing the injuries, suffering, and death of Suzanne Fountain.

**COUNT TWO: General Statutes § 52-555 Wrongful Death/Negligence**

119.   Plaintiff incorporates and re-alleges the above paragraphs as if stated fully here.

120.   Ruger was subject to the general duty imposed on all persons not to expose others to reasonably foreseeable risks of injury.

121.   Ruger had a duty to exercise reasonable care in manufacturing, designing, selling, offering for sale, marketing, and shipping its firearms, including AR-15-style pistols with stabilizing braces, and to refrain from engaging in any activity creating reasonably foreseeable risks of injury to others. Ruger's duty of care was heightened due to the dangerous and lethal nature of its products.

122.   An ordinary person in Ruger's position would anticipate the foreseeable and grievous harm that would result to third parties if AR-15-style short-barreled rifles were designed, manufactured, marketed, and sold negligently and unlawfully under the NFA, and without the rigorous screening and registration requirements imposed thereby.

123.   Ruger breached this duty to exercise reasonable care by producing, marketing, and selling a weapon properly classified as a short-barreled rifle under the NFA without taking the necessary, lawful steps to properly register and distribute it in compliance with the NFA. Ruger designed, manufactured, sold, and marketed illegal short-barrel rifles that should not have been available to civilian consumers unless such consumers completed the rigorous NFA-mandated application process.

29

124.   It was likely and it was foreseeable that a shooter with malintent would be attracted to a loophole around the NFA process for short-barreled rifles and purchase and misuse the Ruger AR-556 Pistol. The shooter's purchase and illegal use of the Ruger AR-556 Pistol was a direct and foreseeable consequence of the way Ruger designed, manufactured, sold, and marketed the firearm.

125.   Ruger's conduct was outrageous, and Ruger acted with reckless indifference to the rights and safety of others, including Suzanne Fountain.

126.   Ruger's conduct in negligently designing, manufacturing, marketing, and selling pistols that should have been classified as NFA firearms was a proximate cause of and a substantial factor in causing Ms. Fountain's injury and death.

**COUNT THREE: General Statutes § 52-555 Wrongful Death/Negligence Per Se**

127.   Plaintiff incorporates and re-alleges the above paragraphs as if stated fully here.

128.   Violation of a statutory standard of care can constitute negligence.

129.   The NFA and the GCA were enacted for the purpose of ensuring the health and safety of members of the general public, including more specifically to protect members of the general public from gun violence.

130.   Ms. Fountain was within the class of persons protected by the strict NFA-mandated procedures for manufacturing, registering, and transferring short-barreled rifles and its ban on selling short-barreled rifles without following proper procedures.

131.    The death of Ms. Fountain is of the type of injury that the NFA and the GCA were intended to prevent.

132.    Ms. Fountain's injury and death would not have occurred without Ruger's conduct in negligently designing, manufacturing, marketing, and selling pistols that should have been classified as NFA firearms in violation of the NFA and GCA.

133.    Ruger's conduct was outrageous, and Ruger acted with reckless indifference to the rights and safety of others, including Suzanne Fountain.

134.    Ruger's violation of the NFA and GCA, by negligently designing, manufacturing, marketing, and selling pistols that should have been classified as NFA firearms, was a proximate cause of and a substantial factor in causing Ms. Fountain's death.

**COUNT FOUR: General Statutes § 52-555 Wrongful Death/Public Nuisance**

135.    Plaintiff incorporates and re-alleges the above paragraphs as if stated fully here.

136.    Ruger, like all persons, has a duty not to create a public nuisance.

137.    Ruger created a public nuisance by adopting a practice of distributing short-barreled rifles to civilian purchasers in illegal and negligent ways that enhanced the risk of unlawful violence to members of the public.

138.    Ruger's conduct enabled the shooter to acquire a short-barreled rifle without completing the rigorous and time-consuming NFA-mandated application process.

31

139.   The right to be free from illegal gun violence is enjoyed by the public, and negligently and illegally selling and supplying short-barreled rifles constitutes a substantial and unreasonable interference with that right.

140.   Illegally selling short-barreled rifles without complying with the NFA has a natural tendency to create danger and inflict injury upon the general public.

141.   Upon information and belief, hundreds of thousands of Ruger AR-556 Pistols equipped with SBA3 braces remain in circulation, and are available for resale, and the danger created by them is continuing.

142.   It was unlawful for Ruger to illegally sell short-barreled rifles without complying with the NFA.

143.   Ruger's conduct was outrageous, and Ruger acted with reckless indifference to the rights and safety of others, including Suzanne Fountain.

144.   The existence of the public nuisance created by Ruger was a proximate cause of and a substantial factor in causing the death of Ms. Fountain.

## COUNT FIVE: General Statutes § 52-555 Wrongful Death/Common Law Recklessness

145.   Plaintiff incorporates and re-alleges the above paragraphs as if stated fully here.

146.   Ruger's wanton and reckless indifference to the rights and safety of others was a substantial factor in causing the plaintiff's injuries and losses set forth herein.

147.   Said shooting and the injuries and damages sustained were proximately caused by the common law recklessness of defendant-Ruger.

## PRAYER FOR RELIEF

148.   Ruger's conduct as previously alleged was a proximate cause and a substantial factor contributing to the injuries, suffering, and death of Suzanne Fountain.

149.   On March 22, 2021, Suzanne Fountain suffered the following injuries and losses: (a) terror; (b) ante-mortem pain and suffering; (c) destruction of the ability to enjoy life's activities; (d) destruction of earning capacity; and (e) death.

150.   As a further result of Ruger's conduct, Suzanne Fountain has been permanently deprived of her ability to carry on and enjoy life's activities and her earning capacity has been forever destroyed.

151.   As a further result of Ruger's conduct, Suzanne Fountain suffered great physical, mental, and emotional suffering including the emotional distress with the contemplation of her death.

152.   As a result of the injuries and death of Suzanne Fountain, the Estate of Suzanne Fountain incurred funeral expenses to its financial loss.

WHEREFORE, the Plaintiff claims:

1. Monetary damages;

2. Punitive damages;

3. Attorneys' fees;

4. Costs;

5. Such other relief as the Court may deem appropriate.

THE PLAINTIFF,

**EVERYTOWN LAW**

Eric Tirschwell, Esq.*
Len Kamdang, Esq.*
Carolyn Shanahan, Esq.*
Laura Keeley, Esq.*
450 Lexington Ave
P.O. Box 4184
New York, NY 10017
Tel: (646) 324-8222
Fax: (917) 410-6932
etirschwell@everytown.org
lkamdang@everytown.org
cshanahan@everytown.org
lkeeley@everytown.org
*application for pro hac vice
admission forthcoming*

**CONNECTICUT TRIAL FIRM, LLC**

*/s/ Andrew Garza*
Andrew Garza, Esq.
Andrew Ranks, Esq.
Alexa Mahony, Esq.
437 Naubuc Avenue, Suite 107
Glastonbury, CT 06033
Tel:   (860) 471-8333
Fax:   (860) 471-8332
Juris No. 436558

**Willkie Farr & Gallagher LLP**

Soumya Dayananda, Esq.*
1875 K Street, N.W.
Washington, DC 20006
Tel: (202) 303-1312
Fax: (202) 303-2000
SDayananda@willkie.com
*application for pro hac vice admission
forthcoming*

34

DOCKET NO: FBT-CV 23-6123457S          :          SUPERIOR COURT

NATHANIEL GETZ,                        :          J.D. OF FAIRFIELD
EXECUTOR OF THE ESTATE OF
SUZANNE FOUNTAIN

   v.                                  :          AT BRIDGEPORT

STURM, RUGER & COMPANY, INC.           :          AUGUST 8, 2023


## STATEMENT OF AMOUNT IN DEMAND

The amount of money damages claimed is greater than Fifteen Thousand

Dollars ($15,000.00) exclusive of interest and costs.

THE PLAINTIFF,

*/s/ Andrew Garza*
Andrew P. Garza, Esq.
Connecticut Trial Firm, LLC
437 Naubuc Avenue, Suite 107
Glastonbury, CT 06033
Tel:    (860) 471-8333
Fax:   (860) 471-8332
Juris No. 436558

35

## <u>CERTIFICATION</u>

I certify that a copy of these documents were mailed or delivered electronically or non-electronically on the above date to all attorneys and self-represented parties of record and to all parties who have not appeared in this matter and that written consent for electronic delivery was received from all attorneys and self-represented parties receiving electronic delivery.

Joseph G. Fortner, Jr.
Halloran & Sage, LLP
225 Asylum Street
Hartford, CT 06103
fortner@halloransage.com

<u>/s/ Andrew Garza</u>
Andrew P. Garza, Esq.