UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

NATHANIEL GETZ,                  :
EXECUTOR OF THE ESTATE OF        :
SUZANNE FOUNTAIN,                :
                                 :
        Plaintiff,               :
                                 :
v.                               : Case No. 3:23-cv-1338(RNC)
                                 :
STURM, RUGER & COMPANY,          :
INC.,                            :
                                 :
                                 :
        Defendant                :

RULING AND ORDER

This case arises from a mass shooting at a
supermarket in Boulder, Colorado, on March 22, 2021,
that resulted in the deaths of ten people, including
Suzanne Fountain, a Colorado resident.  Plaintiff
Nathaniel Getz, the executor of Ms. Fountain's estate,
filed the case in state court against defendant Sturm,
Ruger & Company, Inc. ("Ruger"), a Connecticut-based
corporation, which manufactured and sold the weapon
used in the shooting, a Ruger AR-556 Pistol with an
SBA3 stabilizing brace manufactured by non-party SB

1

Tactical.  The claims in the amended complaint are brought pursuant to Connecticut's wrongful death statute, Conn. Gen. Stat. § 52-555, and are predicated on alleged violations of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b(a), and Connecticut common law.  The gravamen of the claims is that Ruger assembled and marketed this weapon as a "pistol" for regulatory purposes, although the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) regarded it as a "short-barreled rifle" under the National Firearms Act ("NFA")[1] and Gun Control Act ("GCA"),[2] which greatly restrict civilian access to "short-barreled rifles," defined as weapons that have a "barrel length [of] less than 16 inches" and are "designed, made, and intended to be fired from the shoulder."  See 26 U.S.C. § 5845(a)(3)-(4), (c).[3]  The

---

[1] 26 U.S.C. §§ 5801 - 5872.

[2] 18 U.S.C. §§ 921 - 931.

[3] The NFA applies only to certain "firearms."  26 U.S.C. § 5861. The Act's definition of "firearm" does not include pistols or ordinary rifles.  But the term "firearm" does include a "rifle having a barrel . . . of less than 16 inches in length."  A "rifle" is defined as a weapon designed or redesigned, made or

amended complaint alleges that Ruger thereby enabled the Boulder gunman to acquire a short-barreled rifle while evading strict federal limits on civilian access to this type of military-grade weapon and that its violation of the NFA and GCA was a substantial factor in causing the death of Ms. Fountain.

Following removal of the case by the defendant pursuant to 28 U.S.C. § 1441(b), the plaintiff has filed a motion to remand.  Under the substantial federal question doctrine, a federal issue embedded in a state-law claim may be sufficiently important to bring a case within the scope of removal jurisdiction provided by § 1441(b).[4]  The plaintiff contends that the

---

remade, and intended to be fired from the shoulder . . . ."  26 U.S.C. § 5845(c).  Thus, a weapon is an NFA "firearm" if it is short-barreled and designed, made, and intended to be fired from the shoulder.

[4] The substantial federal question doctrine recognizes that federal courts and state courts are not fungible and that the need for federal forum safeguards may justify exercising federal question jurisdiction over a state-law claim.  The doctrine "captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." Grable & Sons Metal Prods., Inc. v. Darue Eng'g and Mfg., 545

need to determine whether the defendant's firearm was
intended to be fired from the shoulder, so as to
constitute a "short-barreled rifle" under the NFA, is
an issue of the defendant's subjective intent that does
not support removal.[5]  In response, the defendant relies
heavily on the disputed status of a final rule
published last year by the ATF setting forth criteria
for determining whether a pistol with a stabilizing
brace constitutes a short-barreled rifle because it is
designed, made and intended to be fired from the
shoulder.[6]  The Final Rule is currently being challenged

---

U.S. 308, 312 (2005).  See Report of Federal Courts Study
Committee at 39 (1990)("The basic criterion for creating federal
jurisdiction is that a particular kind of dispute needs a
federal forum.").

[5] "A state law cause of action that requires the interpretation
of a federal regulation, by itself, is not sufficiently
'substantial' to create federal jurisdiction." Dovid v. U.S.
Dep't of Agric., No. 11-CV-2746 (PAC), 2013 WL 775408, at *12
(S.D.N.Y. Mar. 1, 2013), aff'd sub nom. Congregation Machna
Shalva Zichron Zvi Dovid v. U.S. Dep't of Agric., 557 Fed. Appx.
87 (2d Cir. 2014).

[6] Factoring Criteria for Firearms with Attached "Stabilizing
Braces," 88 Fed. Reg. 6478 (Jan. 31, 2023)("Final Rule").  The
Final Rule amends the NFA's and GCA's definition of "rifle" to
state that "the term 'designed or redesigned, made or remade,
and intended to be fired from the shoulder' shall include a
weapon that is equipped with an accessory, component, or other
rearward attachment (e.g. a 'stabilizing brace') that provides
surface area that allows the weapon to be fired from the
shoulder, provided other factors . . . indicate that the weapon

in federal court actions brought under the
Administrative Procedure Act ("APA") and the Second
Amendment.  See, e.g., Mock v. Garland, 75 F.4th 563,
578 (5th Cir. 2023)(reversing district court's denial
of preliminary injunction against implementation of the
Final Rule), on remand, Mock v. Garland, No. 4:23-cv-
95, 2023 WL 6457920 (N.D. Tex. Oct. 2, 2023)(granting
preliminary injunction on the ground that the Final
Rule fails the APA's "logical-outgrowth test" requiring
that it be a logical outgrowth of the proposed rule
previously published for public comment).  The

---

is designed, made, and intended to be fired from the shoulder."
27 C.F.R. 478.11.  The other factors are whether the weapon has
a weight, overall length, or length of trigger pull consistent
with similarly designed rifles; whether it is equipped with a
site or scope for shoulder firing; whether the surface area that
allows the weapon to be fired from the shoulder is a buffer
tube, receiver extension or other rearward attachment that is
necessary for the cycle of operations; the manufacturer's direct
and indirect marketing and promotional materials indicating the
intended use of the weapon; and information demonstrating the
likely use of the weapon in the general community.  Id.  Under
the Final Rule, if a firearm with a stabilizing brace is a
short-barreled rifle, the owner has 120 days to register the
firearm.  Alternatively, the owner can remove the short barrel
and attach a 16-inch or longer rifled barrel; remove and dispose
of or alter the stabilizing brace so it cannot be reattached;
turn the firearm into the ATF; or destroy the firearm.

defendant argues that in order to determine whether it
intended its AR-556 Pistol with an SBA3 brace to be
fired from the shoulder within the meaning of the NFA
and GCA, it is first necessary to decide whether to
adopt the "approach" taken by the ATF in the Final
Rule, and that this is an issue of sufficient
importance to federal firearms regulation generally to
warrant a federal forum.  I conclude that the case is
not removable and grant the motion to remand.

                            I.

        Since its enactment in 1934, the NFA has regulated
short-barreled rifles because they have the firepower
of a rifle but can be concealed and manipulated more
easily than an ordinary rifle making them particularly
useful to violent criminals.[7]  When Congress amended the
NFA in 1968, it made a finding that "short-barreled

---

[7] The NFA imposes taxes on persons engaged in the business of
importing, manufacturing, and dealing in "firearms" as defined
by the Act and requires federal registration of all NFA
firearms.  The purpose of the NFA, as stated by the ATF, is "to
curtail, if not prohibit, transactions in NFA firearms."  See
National Firearms Act, Bureau of Alcohol, Tobacco, Firearms and
Explosives, atf.gov/rules-and-regulations/national-firearms-act.

rifles are primarily weapons of war and have no appropriate sporting use or use for personal protection[.]"  Sen. Rep. No. 90-1501, at 28 (1968). Short-barreled rifles are also regulated under the GCA.[8]

Under the NFA, manufacturers must register each short-barreled rifle they produce in the National Firearms Registration and Transfer Record ("NFRTR"), and before transferring a short-barreled rifle to any individual or entity must file a transfer application with the ATF and obtain its approval of the transfer. 26 U.S.C. § 5812; 27 C.F.R. §§ 479.84-479.87; 479.101-479.103.  If a manufacturer fails to register and transfer a short-barreled rifle in compliance with the NFA, the firearm is subject to seizure and forfeiture, and the manufacturer is subject to criminal penalties. See 26 U.S.C. §§ 5871, 5872.

Civilian purchasers of short-barreled rifles are

---

[8] Enacted after the assassinations of President John F. Kennedy, Attorney General Robert F. Kennedy and Dr. Martin Luther King, the GCA imposed stricter regulation on the firearms industry, created new firearms offenses under United States Code, Title 18, and prohibited the sale of firearms and ammunition to certain categories of persons.

also subject to strict federal regulations.  To acquire a short-barreled rifle, a prospective purchaser must apply to the ATF for approval of the purchase and, if approval is given, register the transfer in the NFRTR. The application process requires purchasers to submit a completed application form along with passport photos and fingerprint cards, pay a special tax, notify local law enforcement officials and undergo a background check.  No purchase can be completed – and no transfer can occur – until the ATF's approval is received.

## II.

The amended complaint makes detailed allegations concerning Ruger's conduct and intent, and that of SB Tactical, many on the basis of "information and belief."  The allegations may or may not be true.  But the following allegations are assumed to be true for purposes of ruling on the motion to remand.

Beginning in the Spring of 2019, Ruger knowingly designed, manufactured and marketed AR-556 Pistols configured with SB Tactical's SBA3 brace in order "to

cater to civilian consumer demand for short-barreled rifles available outside the rigorous, expensive, and time-consuming NFA approval process." An AR-556 Pistol equipped with an SBA3 Brace meets the specifications for a short-barreled rifle set forth in the NFA because its barrel is less than 16 inches long, and it is designed, made and intended to be fired from the shoulder. Ruger no longer sells this weapon, but hundreds of thousands are in circulation.

An AR-556 Pistol with an SBA3 brace is similar in design and function to Ruger's AR-556 Rifle, an AR-15-style rifle. Both are semi-automatic, weigh about the same, use rifle-caliber ammunition and are designed for "shouldering," which enables the user "to direct the rifle's firepower more accurately and better manage the rifle's recoil." The main difference between the two is the length of the barrel. The barrels of AR-556 Pistols range from 9.5 to 10.5 inches, depending on the model, whereas the barrels of AR-556 Rifles all exceed 16 inches. Because of the difference in barrel length,

an AR-556 Pistol equipped with an SBA3 brace offers the "devastating firepower" of an AR-15-style rifle with the "concealability and maneuverability" of smaller guns.

Ruger's AR-556 Pistols with SBA3 braces are "near-duplicates" of short-barreled rifles that Ruger manufactured for the law enforcement market, the AR-556 MPR.  The law enforcement-only rifles, which are properly labeled and registered as short-barreled rifles by Ruger, and the AR-556 Pistols with SBA3 braces, which are not, "share near-identical specifications."[9]

The events in Boulder can be traced to a decision by the ATF in 2012, in response to a request by SB Tactical, that a rearward attachment to a pistol would not alter the pistol's classification under the NFA. SB Tactical represented that the attachment it

---

[9] The only differences between them "are minimal: the MPR rifles have conventional shoulder stocks, while the Pistols have SB Tactical SBA3 braces that function as shoulder stocks; the pistol grips differ between the two models; and Ruger includes . . . sights with the MPR rifles, but did not do so with the Pistols – though, identical sights and other aiming devices could be added to the Pistols by users."

submitted for the ATF's review – a rudimentary device
to be secured to the user's wrist by Velcro straps -
would serve as an aid to one-handed firing of handguns
by persons with disabilities.

In retrospect, the ATF's decision opened the door
to what quickly became a thriving market for short-
barreled rifles that could be bought and sold like
basic shotguns.  The SBA3 brace, which was released to
the market in 2018, resembles a conventional shoulder
stock in size, shape and function.  It bears no
resemblance to the 2012 device for use with Velcro
straps and functions poorly, if at all, as a
stabilizing brace to support one-handed firing of 5.6
pound or heavier gun, such as the AR-556 Pistol.  SB
Tactical intended the SBA3 brace to be used to shoulder
AR-15-style "pistols" while evading NFA registration of
what would otherwise be short-barreled rifles.

In July 2018, ATF sent SB Tactical a cease-and-
desist letter, instructing it to stop marketing as "ATF
Compliant" several of its stabilizing brace models,

including the SBA3, which had not been submitted for ATF evaluation.  The letter stated that the ATF did "not approve 'stabilizing braces' which are similar or based off shoulder stock designs."  Nonetheless, Ruger and SB Tactical proceeded to work together to bring to the civilian market Ruger's AR-556 Pistol with the SBA3 brace.

In May 2019, SB Tactical submitted to the ATF for review and classification a Ruger AR-556 Pistol with an SBA3 brace in a nearly identical configuration to the one used by the Boulder gunman.  In March 2020, the ATF responded with a 26-page letter containing a detailed review and analysis of the objective design features of the combination.  The ATF concluded that the weapon was "properly classified as a 'short-barreled rifle.'"  The letter did not constitute final agency action, but it gave SB Tactical notice of ATF's conclusion that the weapon was not lawfully classified as a pistol.

As a result of the ATF's letter to SB Tactical, Ruger knew or should have known by March 2020, that ATF

considered a Ruger AR-556 Pistol with an SBA3 brace to be a short-barreled rifle subject to NFA regulation. But Ruger failed to register and transfer its AR-556 Pistols as required by the NFA.

Approximately one year later, on March 16, 2021, the Boulder gunman purchased his Ruger AR-556 Pistol with an SBA3 brace at a licensed firearms dealer in Colorado.  Because Ruger had failed to properly register the weapon as a short-barreled rifle in the NFRTR, he was able to walk out with the weapon that day.

Six days later, the gunman brought the weapon to a King Soopers supermarket in Boulder and used it to kill Ms. Fountain and nine others in mere minutes.  "During the deadly rampage at the King Soopers, [he] shouldered the AR-556 Pistol, as Ruger designed, made and intended it to be used."

The Boulder gunman "did not fall through a crack in the NFA-mandated process."  Instead, he took advantage of a "gaping hole created by Ruger's refusal

to treat its AR-556 Pistols as the short-barreled
rifles they are.  Ruger profited from consumer demand
for unregistered short-barreled rifles, and 10 people
lost their lives."  Ruger's knowing violations of the
NFA and GCA were a proximate cause of and a substantial
factor in the deaths of Ms. Fountain and the other
victims of the shooting.

Ruger violated CUTPA and breached a duty to
exercise reasonable care under Connecticut common law
"by producing, marketing and selling a weapon properly
classified as a short-barreled rifle under the NFA
without taking the necessary, lawful steps to properly
register and distribute it in compliance with the NFA."
In doing so, it "marketed illegal short-barreled rifles
that should not have been available to civilian
consumers unless such consumers completed the rigorous
NFA-mandated application process."  Further, "[i]t was
likely and foreseeable that a shooter with malintent
would be attracted to a loophole around the NFA process
for short-barreled rifles and purchase and misuse the

Ruger AR-556 Pistol.  The Boulder gunman's purchase and illegal use of the Ruger AR-556 Pistol was a direct and foreseeable consequence of the way Ruger designed, manufactured, sold and marketed the firearm."

### III.

### A.

The question is whether the plaintiff's state-law claims are subject to removal pursuant to 28 U.S.C. § 1441(b) on the ground that their success depends on whether the weapon at issue constitutes an NFA "short-barreled rifle."  As the party asserting federal jurisdiction, the defendant "bears the burden of demonstrating the propriety of removal."  Cal. Pub. Emps. Ret. Sys. v. WorldCom, Inc., 368 F.3d 86, 100 (2d Cir. 2004) (quoting Grimo v. Blue Cross/Blue Shield of Vt., 34 F.3d 148, 151 (2d Cir. 1994)).  "In light of the congressional intent to restrict federal court jurisdiction, as well as the importance of preserving the independence of state governments, federal courts construe the removal statute narrowly, resolving any

doubts against removability." Lupo v. Human Affairs
Intern., Inc., 28 F.3d 269, 274 (2d Cir. 1994) (quoting
Somlyo v. J. Lu-Rob Enters., Inc., 932 F.2d 1043, 1045-
46 (2d Cir. 1991)), superseded on other grounds by Rule
as stated by Contino v. United States, 535 F.3d 124,
127 (2d Cir. 2008).

        Under the well-pleaded complaint rule, a plaintiff
who wants a state court forum typically can secure one
by confining the complaint to causes of action provided
by state law.  However, under the artful pleading
doctrine, a plaintiff cannot frustrate a defendant's
right to remove a case when a cause of action in the
complaint, if properly pleaded, would fall within the
scope of federal question jurisdiction provided by 28
U.S.C. § 1331.  See 14C Wright and Miller, Federal
Practice & Procedure § 3722.1 (Rev. 4th ed.)("Wright
and Miller").  One type of artful pleading case
involves state law causes of action that are completely
preempted by federal law.  In such a case, the state-
law causes of action are recharacterized as federal in

nature and thus subject to removal.  Another type
involves state-law causes of action that require
resolution of a substantial question of federal law.

The Supreme Court has devised a four-part test
to determine whether a federal issue embedded in a
state-law claim warrants the exercise of federal
question jurisdiction.  The federal issue must be (1)
necessarily raised, (2) actually disputed, (3)
substantial, and (4) capable of resolution in federal
court without disrupting the federal-state balance
approved by Congress." Gunn v. Minton, 568 U.S. 251,
258 (2013).  "Where all four of these requirements are
met . . . , jurisdiction is proper because there is a
'serious federal interest in claiming the advantages
thought to be inherent in a federal forum,' which can
be vindicated without disrupting Congress's intended
division of labor between state and federal courts."
Id. (quoting Grable, 545 U.S. at 314).  Cases that
satisfy the four-part test comprise a category that is

"slim."  See Empire Healthchoice Assurance, Inc. v. McVeigh, 547 U.S. 677, 701 (2006).

Ruger contends that whether it violated the NFA and GCA as alleged in the amended complaint is an issue that satisfies all four requirements.  The plaintiff concedes that the first two requirements are met but argues that the third and fourth requirements are not.  I agree with the plaintiff that the issue is not substantial under the Grable-Gunn test.  Because this requirement is not met, I do not address the parties' arguments concerning the federal-state balance.

B.

To qualify as a substantial federal issue warranting removal under 28 U.S.C. § 1441(b), "it is not enough that the federal issue [is] significant to the particular parties in the immediate suit; that will always be true when the state claim 'necessarily raise[s]' a disputed federal issue."  Gunn, 568 U.S. at 260.  Rather, a substantial federal issue is one that is important to "the federal system as a whole."  Id.

Whether an issue warrants a federal forum requires "a careful, case-by-case judgment." NASDAQ OMX Grp., Inc. v. UBS Sec., LLC, 770 F.3d 1010, 1028 (2d Cir. 2014).

In making this case-specific determination, Justice Stewart's "I know it when I see it" test may be better than a checklist of factors.  The question of where a case will be adjudicated is time-sensitive and the process of painstakingly weighing an array of factors can lead one to lose the forest for the trees. After every factor is considered, the ultimate question will still be whether the plaintiff's claims, although "appear[ing] in state raiment," Grable, 545 U.S. at 324, are essentially federal in nature.  Nonetheless, published decisions provide a checklist of factors for determining if a federal issue is sufficiently "central" to a state claim to satisfy the substantiality test.

When, as here, state-law claims incorporate a federal standard as a basis for liability, the principal factors are:

- whether Congress has provided a federal private right of action to enforce the federal law incorporated in the state-law claim;
- whether the state-law claim is preempted by federal law;
- whether the federal issue is primarily one of fact or law;
- the relative prominence of the federal issue compared to state issues (cf. 28 U.S.C. § 1367); and
- whether the federal issue is outcome determinative.

To test the result suggested by these factors, courts consider:

- the need for uniformity in interpreting and applying the federal law at issue;
- the degree of federal interest in the litigation; and
- the need for federal forum safeguards (i.e., the degree to which, if at all, adjudicating the issue in federal court is justified by the federal court's relative expertise in matters of federal law, its inherent sensitivity as a federal entity itself to federal rights and interests, and the judicial independence guaranteed by Article III of the Constitution).

See 14C Wright & Miller, § 3722.1, nn.62-63 (collecting cases).

Having considered each of these factors, I conclude that the federal issue embedded in the plaintiff's state-law claims does not bring the case within the

scope of the removal jurisdiction provided by §
1441(b).

C.

In support of the motion to remand, plaintiff
relies primarily on Merrell Dow Pharms. Inc. v.
Thompson, 478 U.S. 804 (1986), where the Court held
that a state-law claim invoking a federal standard for
determining the existence of tort liability under state
law did not give rise to federal question jurisdiction
for removal purposes.  I agree that Merrell Dow
strongly counsels in favor of a remand.

In Merrell Dow, residents of Scotland and Canada
filed two separate but nearly identical complaints in
Ohio state court to recover damages against the maker
of Benedictin, a drug used to alleviate morning
sickness, alleging that the drug had caused multiple
birth deformities in their children.  Both complaints
included a negligence per se cause of action under
state law predicated on the defendant's misbranding of
the drug in violation of the Food Drug and Cosmetics
Act.  21 U.S.C. §§ 302-393 (1988).  The plaintiffs

alleged that the defendant's violation of the Act's
labeling requirements proximately caused the birth
defects and constituted a rebuttable presumption of
negligence under state law.  The defendant removed the
two cases to federal district court (where they were
consolidated) on the ground that the negligence per se
cause of action fell within the scope of federal
question jurisdiction.  The plaintiffs moved to remand
arguing that the cause of action did not arise under
federal law but merely invoked the FDCA's misbranding
provisions as relevant to the applicable standard of
care under state law.  The district court denied the
remand motion but dismissed the action on forum non
conveniens grounds.  The Sixth Circuit ordered both
cases remanded to state court on the ground that
federal question jurisdiction was lacking.  The Supreme
Court affirmed.

   The Court ruled that the negligence per se cause
of action did not arise under federal law because
whether the defendant misbranded the drug did not

fundamentally change the state tort nature of the action.  Moreover, in determining whether federal question jurisdiction was available under § 1331, it was significant that Congress had not provided a private right of action for violations of the FDCA. See 478 U.S. at 814 n.12, 817.  The Court reasoned that "it would . . . flout, or at least undermine, congressional intent to conclude that federal courts might nevertheless exercise federal-question jurisdiction and provide remedies for violations of that federal statute solely because the violation . . . is said to be a . . . 'proximate cause' under state law."  Merrell Dow, 478 U.S. at 812.[10]

Merrell Dow precipitated a circuit split over whether the removability of a state-law claim incorporating a federal standard depended on the existence of a federal private right of action.  See Mr. Smith Goes to Federal Court: Federal Question

---

[10] The four dissenting justices thought that federal question jurisdiction was required to assure adequate Article III oversight of FDCA-related issues.

Jurisdiction Over State Law Claims Post-Merrell Dow,
115 Harv. L. Rev. 2272, 2280-82 (2002).  Addressing
this split in Grable, the Court clarified that "Merrell
Dow should be read in its entirety as treating the
absence of such [federal cause of action] as evidence
relevant to, but not dispositive of, the 'sensitive
judgments about congressional intent' required by §
1331."  545 U.S. at 318.  The Court explained that in
Merrell Dow, "the combination of no federal cause of
action and no preemption of state remedies for
misbranding" provided an "important clue to Congress's
conception of the scope of jurisdiction to be exercised
under § 1331."  Id.

    The combination discussed in Grable is present in
this case: neither the NFA or the GCA provides a
federal private right of action, and the plaintiff's
claims are not completely preempted.

    On the latter point, the GCA itself states:
    No provision of this chapter shall be construed
    as indicating an intent on the part of Congress
    to occupy the field . . . unless there is a
    direct and positive conflict between such

provisions and the law of the state so that the
two cannot be reconciled.

18 U.S.C. § 927.

There is no such "direct and positive conflict" in
this case.  As both parties agree, the plaintiff's
claims seek to vindicate the ATF's position, as set
forth in its 26-page March 2020 letter to SB Tactical,
that the weapon at issue is an NFA short-barreled
rifle.

The absence of complete preemption in this case is
confirmed by decisions in previous cases against
firearms manufacturers under state law that were
removed to federal court.  See, e.g., City of Gary v.
Smith & Wesson Corp., 94 F.Supp.2d 947 (N.D. Ind.
2000); City of Camden v. Beretta U.S.A. Corp., 81
F.Supp.2d 541 (D.N.J. 2000); City of Boston v. Smith &
Wesson Corp., 66 F.Supp.2d 246 (D. Mass. 1999).  In
these cases, municipalities sued firearms manufacturers
in state courts seeking to hold them liable under state
tort law on theories of nuisance and negligence.  The
defendants removed the cases on the basis of the

complete preemption doctrine, arguing that the Commerce
Clause and the GCA preclude all state-law claims that
tend to impose regulation on the manufacture and sale
of firearms.  All the cases were remanded to state
court because the defendants failed to establish that
Congress intended to completely preempt state
regulation of interstate commerce in firearms, and a
defense based on less than complete preemption does not
support removal.  See City of Gary, 94 F.Supp.2d at
948-49.[11]

Because the "important clue" concerning
congressional intent that led to the remand in Merrell
Dow is also present here, it is necessary to consider
whether this case is distinguishable on the issue of
congressional intent.[12]  In this regard, I have

---

[11] Similar cases seeking to hold firearms manufacturers
accountable under state law have been brought directly in
federal court on the basis of diversity jurisdiction.  See
N.A.A.C.P. v. AcuSport, Inc., 271 F.Supp.2d 435, 455 (E.D.N.Y.
2003); Hamilton v. Beretta U.S.A. Corp., 264 F.3d 21 (2d Cir.
2001); Halberstam v. S.W. Daniel, Inc., No. 95-CV-3323
(E.D.N.Y. 1998).
[12] There is some support for the view that lack of complete
preemption suffices to prevent removal.  See City of Gary, 94
F.Supp.2d at 951 (any preemptive effect the GCA may have serves
only as a defense, and thus cannot be a basis for removal); see

considered whether it is distinguishable due to the
Protection of Lawful Commerce in Arms Act (PLCAA),
which affords manufacturers and sellers of firearms
immunity from civil liability arising from misuse of
their products by third parties.  15 U.S.C. §§ 7902(a),
7903(5)(A)(2012).

In Soto v. Bushmaster Firearms Int'l, LLC, 331
Conn. 53 (2019), the Connecticut Supreme Court held
that claims for wrongful death predicated on the
defendant's alleged violations of CUTPA fell within the
"predicate exception" to the immunity provided by the
PLCAA, which permits civil actions alleging that "a
manufacturer or seller of a [firearm] knowingly
violated a State or Federal statute applicable to the
sale or marketing of the [firearm], and the violation
was a proximate cause of the harm for which the relief

---

also Wright & Miller, § 3722.1 n.36 ("some courts have suggested
that the artful-pleading exception to the well-pleaded complaint
rule is coextensive with the complete preemption doctrine").  In
light of Grable, however, I assume that lack of complete
preemption does not dictate the outcome of the substantiality
test.

is sought . . . ."  15 U.S.C. § 7903(5)(A)(iii).  The
Court gave careful consideration to whether Congress
intended to limit the scope of the predicate exception
to violations of firearms-specific laws, thereby
conferring immunity from claims alleging violations of
unfair trade practices laws.  See Soto, 331 Conn. at
116-56.  Based on detailed analysis of the statute's
text and legislative history, the Court concluded that
the answer is no.

I agree with the analysis in Soto and conclude
that the plaintiff's CUTPA claim is permitted by the
predicate exception to PLCAA-immunity.  It does not
necessarily follow that Congress intended claims that
qualify for the predicate exception to be adjudicated
in state court, a point on which the predicate
exception is silent.  In the absence of a contrary
indication, however, it is reasonable to infer that
Congress intended qualifying civil actions to be
adjudicated in state court.

Remanding this case is further supported by the
following considerations.  As the plaintiff correctly
emphasizes, whether Ruger violated the NFA and GCA by
selling a weapon designed, made and intended to be
fired from the shoulder is primarily an issue of
historical fact that requires a jury to scrutinize
Ruger's conduct and determine its actual subjective
intent.  The need to conduct "an individualized
assessment of both the scope of the [federal provision]
at issue and the particular conduct alleged to fall
within (or without) that [provision]" is not enough to
confer federal-question jurisdiction.  In re Standard &
Poor's Rating Agency Litig., 23 F. Supp.3d 378, 398
(S.D.N.Y. 2014).

Furthermore, the issue of Ruger's intent, although
plainly significant to the state-law claims, is not
outcome determinative.  If a jury were to find that
Ruger knowingly violated the NGA and GCA by catering to
consumer demand for short-barreled rifles outside the
NFA-mandated application process, that would not be the

end of its deliberations.  The jury would still have to
decide whether Ruger's conduct violated CUTPA and was a
substantial factor in causing the death of Ms.
Fountain.  The paramount importance of the causation
issue is illustrated by the <u>Halberstam</u> case, cited
earlier, <u>supra</u> note 9, where the issue was decisive.

D.

In opposition to the motion to remand, Ruger
argues that the plaintiff's claims make it necessary to
decide as a matter of law the "approach" that should be
used in determining whether a weapon is designed, made
and intended to be fired from the shoulder for purposes
of the NFA and GCA.  More specifically, it contends
that it is necessary to assess the validity of the
"approach" taken by the ATF in the Final Rule.  In
doing so, it attempts to liken the parties' dispute to
that in <u>Grable</u>, where the "only legal or factual issue
contested in the case" was a "nearly pure issue of law"
which "could be settled once and for all and thereafter
would govern numerous . . . cases."  <u>See</u> <u>Empire</u>

Healthchoice Assurance, 547 U.S. at 700-01 (citing
Grable, 545 U.S. at 315).

The defendant's argument is not persuasive.  The
Final Rule applies ex ante to all pistols with
stabilizing braces and has no direct bearing on the
disputed issue of whether Ruger violated the NFA and
GCA by assembling and marketing as "pistols" for
regulatory purposes what it knew to be NFA short-
barreled rifles.  The issue of Ruger's actual
subjective intent is backward-looking and situation-
specific, and its resolution does not require assessing
the optimal "approach" to be used to determine whether
a weapon is intended to be fired from the shoulder for
purposes of the NFA and GCA.

Ruger argues that a jury verdict in favor of the
plaintiff could have significant consequences for all
manufacturers and sellers of pistols with stabilizing
braces, and all owners of the weapon at issue and
substantially similar weapons, which number between 3
and 7 million.  I agree that a jury verdict in favor of

the plaintiff, although having no preclusive effect on
the rights and potential liabilities of nonparties,
could encourage the ATF to persist in treating similar
pistols with stabilizers as short-barreled rifles,
consistent with its March 2020 letter to SB Tactical
and the Final Rule.  This commonsense consideration has
some weight because the substantiality inquiry looks to
the impact that adjudication of the federal issue could
have on nonparties.  But it would be odd to provide a
federal forum for the plaintiff's state-law claims on
the ground that they seek to hold Ruger accountable for
defying the position taken by the ATF in its March 2020
letter.  And in this instance what really matters to
nonparties, objectively speaking, is whether the Final
Rule can withstand scrutiny under (1) the APA and (2)
the Second Amendment.  Neither of those questions is
necessarily raised by the plaintiff's claims.

Ruger argues that the federal interests affected by
the NFA and GCA's regulatory scheme warrant the
exercise of federal jurisdiction, citing NASDAQ OMX

Group, Inc. v. UBS Sec., LLC, 770 F.3d 1010 (2d Cir.
2014).  In NASDAQ, the Second Circuit resolved state-
law claims arising from NASDAQ's handling of Facebook's
initial public offering ("IPO").  Id. at 1012-13.  The
Court concluded that the disputed federal issue -
"whether NASDAQ violated its [federal] Exchange Act
obligation to provide a fair and orderly market in
conducting an IPO" - was substantial.  Id. at 1024.
The Court pointed to a statement by the Securities
Exchange Commission, issued specifically in connection
with NASDAQ's handling of the Facebook IPO, that
described exchanges like NASDAQ as "critical components
of the National Market System, which provide[] the
foundation for investor confidence in the integrity and
stability of the United States' capital markets."
NASDAQ, 770 F.3d at 1024-25); see SEC Release No. 34-
69655, 2013 WL 2326683, at *1.

     The defendant has not shown that the federal
interest implicated in its alleged violation of the NFA
and GCA rises to the level of the federal interest

involved in NASDAQ's alleged violation of its
obligation to provide a fair and orderly market for the
Facebook IPO.  Assessed in light of the relative
importance of the issue to the federal system as a
whole, the complexity of the regulatory system and the
need for uniformity, the issue presented here is more
like the one in Merrell Dow than the one in NASDAQ.

This is not to suggest that federal regulation of
firearms lacks importance for the federal system as a
whole, that the regulatory system is uncomplicated, or
that uniformity in decisions interpreting and applying
the NFA and GCA is not a worthy objective.  It is a
matter of degree.

The issue-specific substantiality inquiry can lead
to the exercise of removal jurisdiction in cases
involving state-law claims against firearms
manufacturers.  This is well-illustrated by the
decision in New York v. Arm or Ally, LLC, 644 F. Supp.
3d 70 (S.D.N.Y. 2022), on which Ruger heavily relies.

In Arm or Ally, the State of New York brought suit
in state court against manufacturers and sellers of
"frames" and "receivers," which can be readily
converted into untraceable "ghost guns."  The State
claimed that the defendants were contributing to a
public health and safety crisis caused by gun violence
by evading NFA requirements intended to curtail gun
crime.[13]  The amended complaint, which pleaded only
state-law claims, invoked a then-recently-enacted state
statute providing liability for gun industry members
that "create, maintain or contribute to a condition in
New York that endangers the safety or health of the
public," N.Y. Gen. Bus. Law § 989-b(1), or fail to
"establish and utilize reasonable controls and
procedures to prevent [their] qualified products from
being possessed, used, marketed, or sold unlawfully in
New York state," id. § 898-b(2).  The State also

---

[13] The State alleged that the defendants were evading the
rigorous investigation and review process required to become a
registered federal firearms licensee.  In addition, they were
evading federal requirements that manufacturers and sellers of
firearms serialize their products, conduct background checks of
purchasers, and keep records of all sales.

invoked state statutes prohibiting repeated acts of
illegality and fraud in the conduct of any business,
New York Executive Law § 63(12), and false advertising
and misrepresentations, N.Y. General Business Law §§
349 and 350, and New York Executive Law § 63(12).

The defendants removed the case on the ground that
the State's claims necessarily raised substantial
issues of federal law.  The defendants argued that the
claims based on the new state statute applicable to gun
industry members – "the Fourth Cause of Action" –
required the State to prove that the products at issue
were "firearms" under federal law because the state
statute defines a "qualified product" by reference to
federal law.  To prevail on the claims based on the
statute prohibiting illegal acts in business, the State
would have to prove that sales made in 2017 through
2019 were illegal under federal law because the state
statute applicable to gun industry members had not yet
gone into effect.  And the misrepresentation-based
claims also referenced federal law.

Judge Furman concluded that the substantial federal question doctrine applied.  "[T]he State's Fourth Cause of Action necessarily raise[d] a federal issue, namely, whether the products at issue [constituted] 'firearms' or 'component parts' thereof within the meaning of federal law." Id. at 79.  The meaning of these terms presented an important issue of federal law because the terms are "central to the federal scheme embodied in the [GCA] . . . , which Congress enacted only after finding that then-existing 'Federal controls' over the 'widespread traffic in firearms' . . . did 'not adequately enable the States to control this traffic . . . and that 'adequate Federal control . . . over all persons engaging in the businesses of importing, manufacturing and dealing in' firearms was necessary to 'properly deal[]' with 'this grave problem.'" Id.  "Underscoring the point, the [ATF] ha[d] issued regulations defining the statutory terms 'frame' and 'receiver,' and recently revised those regulations in an effort to clarify that the term

'firearm' includes 'a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive.'" Id. "Thus . . . the terms 'firearm' and 'component part' – and, more to the point, determining whether the products at issue . . . [fell] within the scope of those terms – could 'have sweeping consequences for the regulatory flexibility of the ATF, the enforcement powers of federal prosecutors, the scope of the state's authority to regulate these products, and the potential liability of thousands of individuals who have acquired these products.'" Id. at 80.

This case is distinguishable because a jury verdict in favor of the plaintiff would not have similarly sweeping consequences. At most, it would encourage the ATF to persist in its view that pistols with stabilizing braces like the weapon at issue here constitute short-barreled rifles, as discussed earlier. Moreover, in finding that the federal issue in Arm or

Ally was "plainly a substantial one," 644 F. Supp. 3d
at 79, Judge Furman relied on a Statement of Interest
filed by the United States stating emphatically that
the meaning of the terms at issue in that case was "of
acute interest to the United States." Id. at 80. No
such statement has been filed in this case concerning
the meaning of the term "short-barreled rifle." In
addition, while the State of New York sought
prospective relief against numerous sellers of various
"frames" and "receivers" readily convertible into ghost
guns, the plaintiff in this case seeks damages on
behalf of Ms. Fountain's estate for harm caused by a
now-discontinued product.

After careful consideration of the parties'
submissions on the substantiality inquiry, I conclude
that the disputed issue of whether Ruger violated the
NFA and GCA does not provide a basis for exercising
removal jurisdiction. The issue does not fundamentally
change the state-law nature of the case; it is fact-
bound and situation-specific to a degree that is

characteristic of private enforcement actions commonly
adjudicated in state courts; the issue is not outcome
determinative; and the federal interest in the parties'
dispute does not "justify resort to the experience,
solicitude, and hope of uniformity that a federal forum
offers on federal issues." Grable, 545 U.S. at 312.[14]

IV.

---

[14] This conclusion is consistent with Tantaros v. Fox News
Network, LLC, 12 F.4th 135, 147 (2d Cir. 2021), which appears to
be the Second Circuit's most recent decision on whether an
embedded federal issue is substantial in the Grable-sense.  The
plaintiff in that case sought to avoid arbitration of claims
arising from an employment contract containing a mandatory
arbitration clause.  She relied on a state statute prohibiting
mandatory arbitration clauses in contracts to the extent "not
inconsistent with federal law."  The Court of Appeals decided
that the federal issue necessarily raised and disputed by the
complaint – whether permitting the plaintiff to avoid
arbitration would be inconsistent with federal law – warranted
the exercise of federal question jurisdiction.  The issue was
substantial for purposes of federal question jurisdiction
because it was purely legal, rather than fact-bound or
situation-specific, and resolution of the issue would inform all
future claims brought under the state statute.  In addition, the
issue implicated the federal policy favoring arbitration
embodied in the Federal Arbitration Act ("FAA").  Whether the
state statute's prohibition of mandatory arbitration clauses
undermined that federal policy was a significant issue
warranting uniform adjudication in federal courts.

Accordingly, the motion for remand is hereby granted.  Because the defendant had a plausible basis for removal, no costs will be imposed.

So ordered this 25th day of April 2024.


_____
/s/  RNC

Robert N. Chatigny
United States District Judge